November 6, 2024

By ECF

The Honorable Peggy Kuo
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    United States v. Syed Aman
        Magistrate Docket No. 24-599 (PK)

Dear Judge Kuo:

        The government respectfully submits this letter requesting that the Court enter a permanent order of detention for defendant Syed Aman because he presents a danger to the community and a significant risk of flight. The defendant was arrested at John F. Kennedy International Airport ("JFK Airport") last night, where he was boarding a flight out of the United States with the intent ultimately to travel to Syria to join the foreign terrorist organization the Islamic State of Iraq and al-Sham ("ISIS").

        The defendant is charged with attempting to provide material support, including services, currency, monetary instruments, and personnel (including himself), to ISIS. As set forth in greater detail below, the defendant in repeated communications throughout 2023 and 2024 expressed his support for ISIS and sent money to a confidential human source (the "CHS") to financially support ISIS in Syria. After providing financial support to ISIS, Aman later began planning to travel to the Middle East to join and fight for ISIS. On November 5, 2024, Aman was arrested while trying to board a flight from JFK Airport to Doha, Qatar for that purpose.

        Given the charges against Aman, there is a presumption that no condition or combination of conditions will secure the safety of the community and Aman's return to court. Moreover, even absent a presumption, Aman presents both a significant danger to the community and a substantial risk of flight if released on bond. Accordingly, for the reasons set forth below, the Court should enter a permanent order of detention pending trial.[1]

---

[1] Detailed herein is a proffer of the relevant facts and a discussion of the applicable law pertaining to the pretrial detention of the defendant. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings). This proffer of facts is not a complete statement of all facts and evidence of which the government is

I.    The Facts

    A.    The Defendant

        Aman is a 28-year-old United States citizen, who currently resides in Franklin Square, New York, where he has lived for a short period of time.

    B.    Background on ISIS

        ISIS is a foreign terrorist organization that, since 2013, has conducted terrorist attacks as part of ISIS's goal of forming an Islamic state or "caliphate." At various times over the past few years, ISIS has controlled territory in Syria and Iraq, and maintained presences in other countries as well, such as Afghanistan.

        ISIS routinely carried out killings and deliberate targeting of civilians; mass executions; persecution of individuals and communities on the basis of their religion, nationality, or ethnicity; kidnapping of civilians; forced displacement of Shia Muslim communities and minorities; killing and maiming of children; rape; and other forms of sexual violence. ISIS recruited thousands of foreign fighters—i.e., non-Syrians and non-Iraqis—from around the globe to assist with its efforts to expand its caliphate in Iraq and Syria. ISIS also leveraged technology—including the internet, social media, and encrypted communications platforms—to spread its violent extremist ideology and for the purposes of inciting adherents to commit terrorist acts. Tens of thousands of extremists have traveled to the Middle East to join ISIS.

        ISIS has also claimed credit for numerous terrorist activities, including attacks against Americans in the United States and against Westerners abroad. Specifically, ISIS supporters have claimed responsibility for, among others, the following attacks in the United States: the May 2015 shooting in Garland, Texas, at an exhibition featuring cartoons of the Prophet Mohammed; the December 2015 shooting in San Bernardino, California, at the Inland Regional Center; the June 2016 shooting in Orlando, Florida, at the Pulse nightclub; the October 2017 West Side Highway truck attack; and the December 2017 attempted bombing of the 42 Street-Port Authority Bus Terminal. ISIS supporters have also continued to publicly express their desire to continue to target and attack the United States and other Western nations.

        ISIS and its supporters have also claimed responsibility for many violent attacks in Europe, South Asia, and Oceania as well, including: the November 2015 shootings and suicide bombings in Paris, France, at the Bataclan concert hall, a sports stadium, and several restaurants; the July 2016 attack upon the Holey Artisan Bakery in Dhaka, Bangladesh, an attack claimed by ISIS, in which more than 25 people, including at least one United States citizen, were killed; the July 2016 truck attack in Nice, France during Bastille Day celebrations; the December 2016 truck

_____

aware or that it will seek to introduce at a detention hearing or trial. Where the content of statements, documents, or written communications are described herein, they are done so in pertinent part and in sum and substance, except where quoted or otherwise indicated.

attack in Berlin, Germany at a Christmas market; the May 2017 suicide bombing in Manchester, United Kingdom at a concert; the August 2017 van attack in Barcelona, Spain; an August 2018 suicide bombing in Kabul, Afghanistan; the April 2019 Easter Sunday bombings in Sri Lanka that killed or wounded more than 700 people; the August 2021 suicide bombing attack at the Kabul airport that killed more than 180 people, including thirteen members of the United States military; the September 2021 ISIS-claimed stabbing attack in New Zealand; the November 2021 shooting and suicide bombing attack at a military hospital in Kabul that killed 25 people; the March 2022 ISIS-claimed shooting and suicide bombing attack at a mosque in Peshawar, Pakistan, that killed or wounded more than 250 people; and the September 2022 suicide bombing attack at the embassy of the Russian Federation in Kabul, in which approximately ten people were killed. Most recently, on March 22, 2024, ISIS-Khorasan, a regional branch of ISIS active primarily in Afghanistan and Pakistan, took responsibility for the terrorist attack at the Crocus City Hall concert venue in Moscow, Russia, an attack that killed more than 130 people and injured hundreds more.

Notwithstanding the degradation of its former strongholds in Syria and Iraq, as the grim summary of ISIS-claimed attacks across the last decade makes clear, ISIS remains a potent and dangerous terrorist organization.

C.    The Offense Conduct

Since in or about 2023, Aman has expressed support for ISIS on social media platforms and shared his desire to commit jihad on its behalf. In or about June 2023, Aman participated in an online ISIS group forum on a social media platform which consisted of individuals sharing ISIS propaganda and discussing subjects such as how to make hijrah[2] and how to provide financial support to ISIS. In the group forum, Aman openly discussed hijrah, jihad, and his support for ISIS. After communicating in the group forum, Aman then contacted directly a confidential human source (the "CHS"), who represented himself or herself in the group forum to be an ISIS supporter and operative in the Middle East. Aman expressed to the CHS Aman's desire to travel to join ISIS in Iraq or north Baghdad. Aman inquired how Aman might locate the mujahideen.[3] Over the course of the next few days, Aman continued to express his desire to make hijrah. Aman described to the CHS the ways in which Aman was preparing for hijrah, including reading a book on jihad.

Aman also shared with the CHS that Aman had authored two manuals for ISIS, one manual on cyber and personal security precautions for supporters of ISIS (the "Cyber Manual),

_____

[2] "Hijrah" is traditionally a religious pilgrimage. In the context of ISIS, "hijrah" is the act of moving to an ISIS territory to join the organization and fight on its behalf.

[3] "Mujahideen" means "religious warriors." In the context of ISIS, the term is used to describe ISIS fighters.

and a second manual aimed to "motivate brothers for Jihad"[4] (the "Realities of this World Manual").

The Cyber Manual is a 34-page manual that details security precautions for the "soldiers of the Khalifah."[8] In the Cyber Manual, Aman stated, "[a]s some of the senior passed leaders have said, do you[r] jihad intelligently, don't post yourself publically of your intention for hijrah jihad." Aman explained, "[b]rother, if you don't take the traditional security precautions, the digital security precautions can only reduce your sentence." Aman detailed steps for hijrah and jihad including learning rifle marksmanship, doing physical training, learning field medic training, and reading the Quran. In this section of the Cyber Manual, Aman stated: "[b]rothers, we do not have an excuse to abandon jihad. Rather, Allah warns us of severe punishment if we do not go forth in jihad." An additional section of the Cyber Manual titled "Security Precautions for Hijrah" advised readers to find wilayaats (i.e., ISIS provinces) that are "easier to enter." Aman stated that "the following are relatively easy to enter in comparison to Syria and Iraq," and listed other areas in which ISIS operated. Aman also suggested that individuals "take a steel pen with you" to the airport in case there were "security forces waiting for you at the airport and try to arrest you, since other weapons are difficult to bring to the airport."

The Realities of this World Manual is a motivational 18-page manual that includes topics such as exposing the "evil" of America, justifying the 9/11 attacks on the United States, inspiring others to fight for ISIS, and refuting popular arguments against supporting ISIS. The Realities of this World Manual also praised the Islamic State as being "on the right path" and that "killing kuffar[5] and aiders of Crusaders is not sinful, rather is rewarded."

In July and August 2023, Aman communicated with the CHS about his desire to send cryptocurrency to the "brothers." Aman detailed the ways in which he could safely send cryptocurrency to the CHS and also repeatedly expressed his desire to commit jihad for ISIS. After several months of no contact with the CHS, Aman reached out to the CHS in January 2024 and said that he was "t[o]o cautious" and that "it prevented [him] from sending" money to the CHS. Aman continued to discuss his plan to send cryptocurrency to the CHS "for jihad only." On or about February 9, 2024, Aman messaged the CHS that he sent $186.64 of cryptocurrency to the brothers. The CHS captured a screenshot of the virtual wallet which confirmed that Aman had in fact sent the cryptocurrency because Aman was the only individual to whom the CHS provided the wallet address. Aman specifically indicated to the CHS that the money was "for mujahideen, to prepare them and supplies."

On or about March 23, 2024, Aman sent a message to the CHS praising the ISIS attack in Russia. As noted above, in that attack ISIS-Khorasan took responsibility for the terrorist attack at the Crocus City Hall concert venue in Moscow, Russia, which resulted in the deaths of

---

[4] In the context of ISIS, "brothers" typically refers to other ISIS members or supporters.

[5] "Kuffar" is the plural of "kafir" in English is a non-believer of Islam. In the context of ISIS, a kafir would refer to non-Muslims and/or Westerners.

130 people and injured hundreds more.  Aman stated in English that "[he] wished some day [he] can fight them too just as [his] brothers did."

After another period of no contact with the CHS, Aman reached out again in October 2024 to "discuss a plan."  Specifically, Aman stated that he was "ready to hijrah and join the jihad."  Aman outlined the specifics steps he would take to prepare for his trip to commit jihad, which included undergoing laser eye surgery so he could participate in military activities, obtaining a credit card for expenses, obtaining his passport, and researching various flight options he could take to obfuscate his ultimate end destination.  Over the course of the next month, Aman constantly discussed his various travel plans and logistics with the CHS.  Aman also repeatedly expressed his concern that law enforcement would stop him at the airport.  Aman time and again reiterated his desire to commit jihad and hijrah and stated they were the most important thing to him.

Aman also constantly expressed the desire to engage in violence.  Specifically, on or about October 24, 2024, Aman messaged the CHS in English and Arabic and stated "I hate the kuffar who deny the path of Allah.  They persecute the Muslims, they persecute me, and they are very arrogant.  May Allah bless us with victory and mujadeen."  Aman continued, "[i]f you don't kill them they will kill us and ruin the earth with decay."  In the same conversation, Aman told the CHS that if Aman were seized at the airport by law enforcement he would "attack them and kill them and be killed.  This is important for me, that Allah gives me bravery and steadfastness."  Aman also stated that he asked "Allah for success and to join with the mujahideen in Syria."

On or about the same day, Aman said that he was finishing his preparation to travel and shared potential flight options with the CHS.  As part of his discussion regarding flight options, Aman stated that he would "buy fake round trip" tickets to Kuwait so that law enforcement is "not suspicious."  Aman stated that once he was in Kuwait he would then buy a ticket to Turkey.  On or about October 25, 2024, Aman attempted to put that plan into effect.  He tried to purchase a ticket to Kuwait, but his credit card company blocked the purchase.  Aman told the CHS that he would attempt to figure out how to book his travel.

On or about October 26, 2024, Aman discussed in English his previous attempt to perform hijrah two years ago and said it was unsuccessful because he had no contacts and his parents had taken his passport.  Aman expressed gratitude that he had met the CHS because it meant that Aman had "a brother and contact as a guide."  Aman stated, "Now a third time my brother is there for me and I am almost there.  I have everything, all I need is to purchase two tickets."

On or about October 29, 2024, Aman again attempted to purchase a plane ticket to Kuwait from a different website.  Aman expressed suspicion that law enforcement was monitoring his travel and online activity and preventing him from purchasing his ticket.  On or about October 30, 2024, Aman sent the CHS screenshots of a booking confirmation and flight details to travel from JFK Airport to Doha, Qatar on November 5, 2024 at 9:30 pm EST.  Although the flight confirmation indicated that Aman had a layover in Doha and would continue traveling to Dhaka, Bangladesh, Aman advised the CHS in English that he would purchase a ticket to Turkey after

arriving in Doha. Aman informed the CHS that "they" would likely interrogate him at the airport and ask why he is traveling. Aman asked the CHS, "What should I say? To visit my wife because of her visa interview? I will be back in two week[s]." Aman elaborated on how he would purchase a ticket to Turkey once he was in Doha and advised further, "When I reach Istanbul airport, I must hurry and leave the airport quickly and disappear before someone follows me."

Aman stated that his journey had "only begun." Aman stated, "All I have to defend myself is a steel pen in case things go wrong and I am arrested, but I do not think they will try to do this . . . . As they do not have any proof of my intentions I think. It is only if they discover this chat in Session, which I will have to delete." As noted above, Aman wrote a manual on security precautions for people who wanted to make hijrah and advised them to carry a "steel pen" to the airport in case law enforcement tried to stop him because other weapons were difficult to bring to the airport. Aman reiterated that he would tell airport personnel that he was traveling to visit his wife for an immigration interview so as not to arise suspicion.

In addition to Aman's direct communications with the CHS, the CHS also observed that, in late October 2024, Aman stated online that he wanted "to kill Americans."

On or about November 5, 2024, Aman traveled to JFK Airport for his flight to Doha, Qatar. Aman checked into his flight to Qatar and processed through security. Aman then proceeded to his gate and was arrested attempting to board his flight. At the time of his arrest, Aman possessed a silver metal pen, similar to the "steel pen" he had previously explained that he would bring to the airport as a weapon to use if law enforcement tried to arrest him. A judicially authorized search of Aman's residence revealed that Aman had a notebook in which he had written various tasks to prepare for his hijrah, including studying to become a mujahideen, which is a fighter, and shaheed, which is a martyr.

## II.    Legal Standard

Under the Bail Reform Act, Title 18, United States Code, Section 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e) (a judicial officer "shall" order detention if "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of dangerousness must be supported by clear and convincing evidence. See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405.

The Bail Reform Act lists the following factors to be considered in the detention analysis: (1) the nature and circumstances of the offenses charged, including whether the offense is a "crime of violence"; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. See 18 U.S.C. § 3142(g).

For certain offenses, including the attempted material support charge contained in the complaint, the law presumes that there is no set of conditions that will reasonably assure the defendant's appearance or the safety of the community. See 18 U.S.C. § 3142(e)(3)(C). This presumption may be rebutted by the defendant, provided the defendant is able to present evidence that he is neither a danger nor a risk of flight. See United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). Even upon such a showing, however, the presumption in favor of detention "does not disappear entirely, but remains a factor to be considered among those weighed[,]" id., because it "reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial" and "represents Congressional findings that certain offenders . . . are likely to continue to engage in criminal conduct undeterred either by the pendency of charges against them or by the imposition of monetary bond or other release conditions." United States v. Stone, 608 F.3d 939, 945-46 (6th Cir. 2010) (internal quotation marks and citation omitted) (ellipsis in original).

III.     The Court Should Enter a Permanent Order of Detention

        As detailed above, there is a presumption that no condition or combination of conditions will permit the defendant to be released on bond. Moreover, the factors to be considered in the detention analysis show that the defendant presents both a significant danger to the community and a substantial risk of flight if released on bond. Accordingly, the Court should enter a permanent order of detention pending trial.

        A.      The Nature and Circumstances of the Offense Charged

        The charged offense and the circumstances surrounding them are extraordinarily serious. The defendant is charged with attempting to provide material support to ISIS. His charged offense involves not only his financial support of ISIS but also his attempt to travel to Syria to join ISIS and fight and martyr himself on its behalf. These considerations demonstrate that the defendant would pose an acute danger if released and, consistent with the Bail Reform Act, he must be detained pending trial to ensure the safety of the community.

        In listing the "nature and circumstances of the offense charged" as a criterion in the detention analysis, the Bail Reform Act specifically provides that the Court is to consider whether the crime charged is, among others, a crime of violence or a Federal crime of terrorism. See 18 U.S.C. § 3142(g)(1). The charged offense falls within this category, confirming that Congress viewed this crime as sufficiently serious to factor against release on bond.

        Indeed, as set forth above, Congress recognized the seriousness of these charged offenses by specifically enumerating 18 U.S.C. § 2339B among those offenses that carry a presumption that no condition or combination of conditions will be sufficient to permit a defendant to be released on bond. Even where a defendant can rebut this presumption, the Court is still required to give some weight to the presumption in the detention analysis, "keeping in mind that Congress has found that these offenders pose special risks" and that "a strong probability arises that no form of conditional release" will assure the defendant's return to court or adequately protect

the community.  <u>United States v. Martir</u>, 782 F.2d 1141, 1144 (2d Cir. 1986) (citation and internal quotation marks omitted).

In this case, the charged offense carries a maximum total potential sentence of up to 20 years' imprisonment, and a Guidelines range that exceeds the statutory maximum sentence. The prospect of a lengthy term of incarceration may reasonably incentivize the defendant to flee and thus helps establish the defendant's status as a serious risk of flight.  Indeed, the defendant constantly discussed with the CHS ways to avoid law enforcement detection such as planning indirect travel routes to Syria and fabricating stories for the purpose of his travel.  There is no reason to believe that Aman would abide by any conditions of release given his persistent efforts to evade law enforcement.  This is especially so when the defendant himself has expressed hatred for non-believers and said that he felt "trapped here in this country."  Instead, there is every reason to think that he will make efforts to flee from the United States so that he can avoid the prospect of a lengthy prison term and fulfill his ultimate goal of joining ISIS to commit jihad.

Throughout his lengthy period of communications with the CHS, Aman has remained persistent in his praise and support for ISIS.  Aman repeatedly expressed to the CHS his plans to join ISIS and fight.  Aman also shared his remorse for not being able to join ISIS on the battlefield sooner.  Specifically, in a message from on or about October 19, 2024, Aman expressed regret to the CHS that he did not fight on behalf of ISIS in Syria or Iraq in 2013.[6]  Aman also stated that he previously desired to travel to Syria to join ISIS two years ago but was unsuccessful then.

Aman has also made statements suggesting his desire to die in combat for, or in a terrorist attack carried out on behalf of ISIS.  For example, Aman stated in reference to kuffar that "[i]f you don't kill them they will kill us and ruin the earth with decay."  He also stated that if he were arrested at the airport by law enforcement he would "attack them and kill them and be killed."  In a recent online group forum, Aman expressed his desire "to kill Americans."  Finally, in a notebook found in Aman's residence, he expressed his desire to study becoming a shaheed, or a martyr for ISIS.

Aman's history demonstrates that he shares ISIS's violent goals and ideology. Taken together, Aman's financial contribution to ISIS, his creation of a security manual and a motivational manual for ISIS, his dissemination of ISIS propaganda, his statements justifying its violent terrorist acts, and his statements expressing his own desire to join ISIS himself and die in violent jihad, his desire to kill Americans, and his desire and attempts over a period of years to travel to Syria to join ISIS make clear that Aman's support for ISIS and his willingness to engage in violence on its behalf shows him to be a significant danger to the community.

---

[6] ISIS acquired territory in Syria and Iraq in 2013 and continued to do so when it established a Caliphate in 2014.

B.    The Weight of the Evidence

The weight of the evidence in this case is overwhelming.  The government's evidence consists of, among other things, Aman's statements to the CHS.  These messages include both communications that detail Aman sending money to the CHS for ISIS as well as planning and logistics to travel abroad to the Middle East to join ISIS.  The government has also obtained statements made by Aman in public postings on social media which state his resolute support for ISIS and desire "to kill Americans."  Additionally, cryptocurrency records document his transfer of Bitcoin to the wallet provided by the CHS to support ISIS.  Phone and financial records also confirm his attempts to book travel to the Middle East and his efforts to clear issues with his credit card company to enable him to do so.  Finally, Aman was arrested at JFK Airport while attempting to board a flight to Qatar, from which he intended to travel to Turkey and then Syria to join ISIS.  Accordingly, this factor weighs in favor of a finding that the defendant is both a danger to the community and a flight risk.

C.    Aman's History and Characteristics and The Danger to the Community Posed by His Release

The defendant's history and characteristics confirm that he is both a grave danger to the community and a substantial risk of flight.  Aman has expressed a willingness to be killed if apprehended by law enforcement, his desire to kill Americans, and his intent to become a martyr on behalf of ISIS.

Aman even advised those interested in committing jihad in his Cyber Manual to "take a steel pen with you" to the airport in case there are "security forces waiting for you at the airport and try to arrest you, since other weapons are difficult to bring to the airport."  He took his own advice and during his conversations with the CHS regarding his preparation to travel, Aman told him that "All I have to defend myself is a steel pen in case things go wrong and I am arrested . . . "  This was not simply theoretical:  After Aman was arrested a silver metal pen was found in his crossbody bag.  As noted above, the defendant is a danger to the community because of his vehement support for terrorism and the steps he took in preparation to participate in exactly that conduct by traveling abroad to join ISIS.

Particularly in light of the presumption of detention that attaches to the serious offense with which Aman has been charged, the government submits that there are no conditions and no combination of conditions of release that would reasonably protect the community from the danger that Aman represents, or assure his appearance as required.

IV.    Conclusion

The defendant is charged with a serious crime that carries a presumption of detention, the evidence against him is overwhelming, and his history and characteristics give no confidence that he will follow the law or abide by release conditions.  Accordingly, the government respectfully submits that no condition or combination of conditions can assure the safety of the

community, the defendant's return to court, or compliance with the Court's directives, and the Court should thus enter a permanent order of detention pending trial.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   /s/ _____
Antoinette N. Rangel
Assistant U.S. Attorney
(718) 254-7481

cc:   Clerk of Court (by ECF)